Filed 2/27/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MDQ, LLC, et al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>GILBERT, KELLY, CROWLEY & JENNETT LLP,<br><br>      Defendant and Appellant;<br><br>CLEOPATRA RECORDS, INC.,<br><br>      Defendant and Respondent. | B283025<br><br>(Los Angeles County<br>   Super. Ct. No. BC607973) |

      APPEAL from a judgment and order of the Superior Court of the County of Los Angeles.  Mark V. Mooney, Judge.  Affirmed.

      Freeman, Mathis & Gary, Timothy W. Kenna, and Rebecca J. Smith for Defendant and Appellant.

      Gutman Law, Alan S. Gutman; and Evan S. Cohen for Defendant and Respondent.

* * * * * * * * * *

## SUMMARY

The question in this interpleader action is which adverse claimant was entitled to the interpleaded funds: a judgment creditor with a properly recorded judgment lien, or an assignee who did not file a financing statement with respect to distributions irrevocably assigned to it by the judgment debtor before the judgment lien was recorded. The answer depends on whether the assignment created a security interest that had to be perfected (but was not) by the filing of a financing statement under California's Uniform Commercial Code (UCC or the Code). We agree with the trial court that although the assignment created a security interest, the judgment creditor is entitled to the interpleaded funds because its recorded judgment lien has priority over the unperfected security interest.

Accordingly, we affirm the judgment. We also affirm the trial court's order requiring the assignee to pay the attorney fees and costs of the plaintiffs in the interpleader action.

## FACTS

### 1.     The Parties and Earlier Proceedings

The four plaintiffs in the interpleader action (MDQ Holding LLC, MDQ LLC, Johnny B. Goode Limited Liability Company and MDQ Vegas LLC) are referred to as the MDQ entities. They are limited liability companies that hold production rights or are producers in different territories of a Tony-award winning Broadway musical, "Million Dollar Quartet." Each of the MDQ entities had control over a portion of the interpleaded funds.

Floyd Mutrux was one of the authors of the musical. He owned Northern Lights, Inc. Mr. Mutrux and/or Northern Lights (collectively, Mutrux) was a member, manager, shareholder or owner of each of the MDQ entities. Mutrux has certain economic

2

rights, including "the right to be allocated profits, and to receive distributions and payments from the MDQ entities."

Two defendants in the interpleader action are adverse claimants to the interpleaded funds:  Cleopatra Records, Inc. (Cleopatra) and Gilbert, Kelly, Crowley & Jennett (Gilbert Kelly or the law firm).

The events that preceded the interpleader action were these:

On July 24, 2012, Cleopatra filed a lawsuit against Mutrux (the Cleopatra litigation).  Gilbert Kelly represented Mutrux in the Cleopatra litigation.

On April 14, 2015, the trial court in the Cleopatra litigation filed a proposed statement of decision in favor of Cleopatra and against Mutrux.  The proposed award to Cleopatra exceeded $1 million.

On April 22, 2015, Mutrux and the law firm executed a "Notice of Assignment and Irrevocable Letter of Direction" dated April 29, 2015 (the assignment).  The recitals included reference to Gilbert Kelly's representation of Mutrux in the Cleopatra litigation, and stated that "[i]n consideration for legal services provided . . . and to be provided hereafter, Mutrux . . . wish[es] to and intend[s] to irrevocably assigned [*sic*] a portion of their economic interests in the MDQ Entities to [Gilbert Kelly].  While the total amount of [Gilbert Kelly] fees incurred as of April 8, 2015 is in excess of $235,000 and will increase with post-trial briefing, the first authorization for payments hereunder on the foregoing will be for $175,000.00."

The assignment notified the MDQ entities that as of April 29, 2015, the MDQ entities "shall make or cause to be made, payment to [Gilbert Kelly] (in lieu of making such

3

payments directly to [Mutrux]) in the various percentages specified below from the total amounts of all distributions, producer office fees, fixed fees, executive producer fees, office fees, profits and/or other payments and fees of any other type payable to [Mutrux] by the MDQ Entities." (Royalties payable to Mr. Mutrux as a writer or director were excluded.) The applicable percentages differed among the MDQ entities (33, 30 or 20 percent).

The assignment provided that: "Payments will be made to [Gilbert Kelly] for $175,000.00, until paid or for so long as any MDQ Distributions are payable to Mutrux." The assignment stated that "[i]f no further authorizations are forthcoming after [Gilbert Kelly] receives $175,000.00, the [MDQ entities] shall resume making MDQ Distributions to Mutrux."

On August 5, 2015, judgment was entered against Mutrux in the Cleopatra litigation in the total amount of $965,851.47.

On August 21, 2015, Cleopatra sought a court order "charging [Mutrux's] interests in the MDQ Entities with payment of the unsatisfied portion" of the August 5, 2015 judgment.

On October 1, 2015, the trial court issued a charging order under Corporations Code section 17705.03.[1] The court ordered the MDQ entities "to pay any and all profits, distributions,

---

[1]     On application by a judgment creditor of a member or transferee of a limited liability company, "a court may enter a charging order against the transferable interest of the judgment debtor for the unsatisfied amount of the judgment. A charging order constitutes a lien on a judgment debtor's transferable interest and requires the limited liability company to pay over to the person to which the charging order was issued any distribution that would otherwise be paid to the judgment debtor." (Corp. Code, § 17705.03, subd. (a).)

4

disbursements or other payments otherwise due to Judgment Debtors [Mutrux], as members of the limited liability companies, directly to counsel for Judgment Creditor Cleopatra," until the August 5, 2015 judgment has been fully satisfied.

The charging order also stated it was not intended to alter rights to payments "established by irrevocable assignments of rights existing prior to July 24, 2012." (That was the date the Cleopatra litigation was filed.) This reference is to an earlier assignment to Katell Productions, Inc. Mutrux had assigned the right to receive a percentage of distributions otherwise owed to Mutrux from the MDQ entities to Katell Productions on January 25, 2012. This assignment was later memorialized and amended in a Notice of Assignment and Irrevocable Letter of Direction, and the MDQ entities began making payments as directed. The Katell Productions assignment is not in dispute. The assignment to Gilbert Kelly concerns percentages of distributions not already assigned to Katell Productions.

**2.     The Interpleader Action**

On January 25, 2016, the MDQ entities filed a complaint in interpleader, naming Gilbert Kelly, Cleopatra, and Mutrux as defendants. Plaintiffs alleged conflicting claims by Cleopatra and Gilbert Kelly to those portions of distributions owed to Mutrux that had not otherwise been assigned to Katell Productions. The MDQ entities deposited the distributions at issue (then about $19,500), and undertook to add any future distributions not owed and remitted to Katell Productions to the interpleaded funds.

The parties filed various pleadings, including answers, a cross-complaint by Cleopatra, and a motion for summary judgment by Gilbert Kelly. The MDQ entities sought an order of discharge and an award of attorney fees and costs.

5

On December 22, 2016, the trial court entered an order that released the MDQ entities from any and all liability to the interpleader defendants, ordered them to continue to deposit any additional distributions with the court, and ordered payment to the MDQ entities of $11,550 from the interpleaded funds for their attorney fees and costs.

On February 1, 2017, the matter went to trial on Cleopatra's cross-complaint, with the parties submitting pretrial briefs and documentation in support of their positions.

Gilbert Kelly argued that a charging order only attaches to a "transferable interest" (Corp. Code, § 17705.03, subd. (a)), and the interests assigned to it "were neither assignable nor transferrable at the time of judgment [August 5, 2015] because they had *already* been assigned to Gilbert Kelly in April 2015."

Cleopatra's trial brief argued the assignment created a security interest that "had to be perfected in order to have priority. It was not perfected (i.e., Gilbert Kelly failed to file a UCC-1 [financing statement]) and, as a result, Cleopatra's Judgment Lien has priority pursuant to [Code of Civil Procedure section] 697.590."

The trial court found that "[t]he intent of the parties in executing the Assignment was to secure payment of an obligation of Mutrux . . . (the debtor) to Gilbert Kelly (the creditor) with the future revenues to be paid by the MDQ entities to Mutrux." The court found the assignment was a security agreement, and Gilbert Kelly did not file a financing statement as required under the UCC. (Cal. U. Com. Code, § 9310.) This failure to record did not render the assignment invalid, the court observed, but it did render the assignment inferior to the judgment lien recorded by Cleopatra under Code of Civil Procedure section 697.590, which

6

governs priorities between conflicting interests. Consequently, Cleopatra was entitled to be paid all monies otherwise payable to Mutrux until the judgment was satisfied.

On February 8, 2017, the court ordered release of $11,550 from the interpleader funds for the attorney fees of the MDQ entities.

On March 3, 2017, Cleopatra filed a motion seeking an order that the $11,550 in attorney fees awarded to the MDQ entities be paid by Gilbert Kelly rather than from the interpleader funds. The trial court granted the motion on May 4, 2017.

Also on May 4, 2017, judgment was entered ordering immediate payment of all interpleaded funds to Cleopatra, and ordering the MDQ entities to pay all subsequent monies otherwise payable to Mutrux, except those allocated to Katell Productions, to Cleopatra.

Gilbert Kelly filed a timely appeal from the judgment and from the court's order requiring Gilbert Kelly to pay the attorney fees awarded to the MDQ entities.

## DISCUSSION

### 1. Appeal from the Judgment – the Priority Issue

Gilbert Kelly argues its assignment has priority because it preceded the charging order, and the assignment did not have to be recorded to have priority because it was not a security interest. The assignment, Gilbert Kelly argues, was "absolute and unconditional" – a "completed transfer of the interest" – before the charging order was made. The interests assigned to Gilbert Kelly, the argument continues, were no longer the "property of the judgment debtor" under section 695.010 of the

7

Code of Civil Procedure,[2] and were no longer a "transferable interest of the judgment debtor" against which a charging order could be entered under Corporations Code section 17705.03.

As the basis for this analysis, Gilbert Kelly relies on *Kinnison v. Guaranty Liquidating Corp.* (1941) 18 Cal.2d 256 (*Kinnison*), where the Supreme Court held that an instrument – an assignment of rents that *had* been recorded – "cannot be said to have contemplated the transfer of a mere security interest." (*Id.* at p. 263.) *Kinnison* continued: "The instrument is phrased as a complete transfer of [the debtor's] interest in the rentals. . . . [T]he rents were relinquished completely, to be applied by [the creditor] in satisfaction of the total outstanding indebtedness. This was not an assignment as further security for the performance of [the debtor's] obligations, but was an attempt to liquidate the debt upon which [the debtor] had been in default for at least eight months at the time the assignment was executed. Unlike the rental assignments accompanying [earlier] deeds of trust . . . , this assignment contemplated an immediate application of the rentals as a means of satisfying the total outstanding debt. . . . [[T]he creditor] held not merely a security interest in the rentals but an absolute assignment of [the debtor's] interest therein." (*Ibid.*)

While Gilbert Kelly's argument has some surface appeal, it suffers from insurmountable flaws. *Kinnison* predated the enactment of California's UCC by more than 20 years. *Kinnison* involved a recorded assignment of rents and profits accruing from

---

[2]     Section 695.010 states that "[e]xcept as otherwise provided by law, all property of the judgment debtor is subject to enforcement of a money judgment."  (Code Civ. Proc., § 695.010, subd. (a).)

8

real property covered by a deed of trust, and did not involve personal property or a question of the priority of conflicting interests. We are not persuaded that its conclusion the creditor there "held not merely a security interest but an absolute assignment" has any pertinence these many years later, when the UCC governs secured transactions in personal property.[3]

In short, this is not a real property transaction. Secured transactions in personal property are governed by division 9 of the UCC. (Cal. U. Com. Code, § 9109, subd. (a)(1) ["this division applies to . . . [¶] . . . [a] transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." (Further undesignated statutory references are to the California UCC.)

Several definitions are pertinent to our discussion. Thus:

---

[3] Indeed, assignments of rents in connection with an obligation secured by real property are now governed by Civil Code section 2938. Section 2938 applies to assignments denoted as "absolute" or otherwise, and provides that such assignments are "effective to create *a present security interest* in existing and future . . . rents . . . or profits of that real property." (*Id.*, subd. (a), italics added.) Thus subdivision (a) states: "A written assignment of an interest in leases, rents, issues, or profits of real property made in connection with an obligation secured by real property, irrespective of whether the assignment is denoted as absolute, absolute conditioned upon default, additional security for an obligation, or otherwise, shall, upon execution and delivery by the assignor, be effective to create a present security interest in existing and future leases, rents, issues, or profits of that real property." (*Ibid.*) The interest granted by such an assignment "shall be deemed fully perfected as of the time of recordation . . . ." (*Id.*, subd. (b).)

9

A " '[s]ecurity interest' " is "an interest in personal property or fixtures which secures payment or performance of an obligation. 'Security interest' includes . . . a payment intangible . . . ."[4] (§ 1201, subd. (b)(35).)

A " '[s]ecurity agreement' " is "an agreement that creates or provides for a security interest." (§ 9102, subd. (a)(74).)

An " '[a]greement,' as distinguished from 'contract,' means the bargain of the parties in fact, as found in their language or inferred from other circumstances . . . ." (§ 1201, subd. (b)(3).)

" 'Collateral' " is "the property subject to a security interest," and includes payment intangibles. (§ 9102, subd. (a)(12).)

Gilbert Kelly contends its assignment did not effect a security interest in Mutrux's distributions. But notably, in its appellate brief Gilbert Kelly does not cite or acknowledge the statutory provisions we have just quoted, or even mention the UCC – this despite Cleopatra's arguments to the trial court, and the trial court's own analysis based on the UCC provisions.

Unlike Gilbert Kelly, we cannot pretend the UCC does not exist. And we cannot pretend it does not apply to assignments – particularly to the assignment of a percentage of the debtor's

---

[4] A " '[p]ayment intangible' " is "a general intangible under which the account debtor's principal obligation is a monetary obligation." (§ 9102, subd. (a)(61).) A " '[g]eneral intangible' " is "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software." (*Id.*, subd. (a)(42).)

10

interest in future distributions, which will revert to the debtor once its debt to Gilbert Kelly is paid.  While Gilbert Kelly's assignment may differ from some other secured transactions, in that the collateral securing Mutrux's obligation to Gilbert Kelly is being paid as it accrues to satisfy that obligation, rather than securing payment from another source, Gilbert Kelly offers us no rationale under which we can conclude that it is not a security interest within the meaning of the UCC.

Having concluded the assignment was a security interest subject to UCC requirements, we see little more that requires discussion.  The priority of a perfected judgment lien over an unperfected security interest is established by section 697.590 of the Code of Civil Procedure.  Section 697.590 defines the terms " '[f]iling' " and " '[p]erfection,' " among others.  (*Id.*, subd. (a)(1) & (2).)  With inapplicable exceptions, subdivision (b) determines "priority between a judgment lien on personal property and a conflicting security interest . . . in the same personal property." (*Id.,* subd. (b).)

"Conflicting interests rank according to priority in time of filing or perfection." (Code Civ. Proc., § 697.590, subd. (b).)[5]  With respect to a security interest, " '[f]iling' " means "the filing of a financing statement pursuant to Division 9 . . . of the Commercial Code." (*Id.*, subd. (a)(1)(B).)  And " '[p]erfection' " means

---

[5]      Code of Civil Procedure section 697.590, subdivision (b) continues:  "In the case of a judgment lien, priority dates from the time filing is first made covering the personal property.  In the case of a security interest . . . priority dates from the earlier of the time a filing is first made covering the personal property or the time the security interest . . . is first perfected, if there is no period thereafter when there is neither filing nor perfection."

11

"perfection of a security interest . . . pursuant to Division 9 . . . of the Commercial Code." (*Id.*, subd. (a)(2).) Under the UCC, with certain exceptions, "a financing statement must be filed to perfect all security interests . . . ." (§ 9310, subd. (a).)

In short, because Gilbert Kelly did not file a financing statement, Cleopatra's judgment lien has "priority in time of filing or perfection" (Code Civ. Proc., § 697.590, subd. (b)).

That leaves us with Gilbert Kelly's insistence, without authority, that the distributions assigned to it were "no longer the 'property of the judgment debtor' as defined in [Code of Civil Procedure section] 695.010" (see fn. 2, *ante*), and no longer a "transferable interest of the judgment debtor" against which a charging order could be issued under Corporations Code section 17705.03. This contention, however, is simply another way of asserting the untenable proposition that the assignment was not a security interest governed by the UCC.

To be clear, there is no dispute that Corporations Code section 17705.03 governs the entry of a charging order "against the transferable interest" of a limited liability company (LLC) member who is a judgment debtor, for the unsatisfied amount of the judgment.[6] (§ 17705.03, subd. (a).) And, the charging order

---

[6] The Corporations Code, title 2.6, governs LLC's. Article 5 governs transferable interests and rights of transferees and creditors of LLC's. A "transferable interest" is personal property. (Corp. Code, § 17705.01.) A transfer is permissible. (§ 17705.02, subd. (a)(1).) A transferee "has the right to receive, in accordance with the transfer, distributions to which the transferor would otherwise be entitled; provided, however, that the pledge or granting of a security interest, lien, or other encumbrance in or against any or all of the transferable interest of a transferor shall not cause the transferor to cease to be a member or grant to the

12

"constitutes a lien on a judgment debtor's transferable interest and requires the limited liability company to pay over to the person to which the charging order was issued any distribution that would otherwise be paid to the judgment debtor." (*Ibid.*) But the claim that there is no "transferable interest" in the future distributions already assigned to Gilbert Kelly is a mistaken view of the statutory language that lacks supporting authority. Section 17705.03 is simply the mechanism by which a judgment creditor may enforce its judgment against an LLC member; it does not establish priorities among creditors, and it does not eliminate UCC requirements applicable to security interests.

As we have seen, priorities among creditors are governed by Code of Civil Procedure section 697.590 ("Conflicting interests rank according to priority in time of filing or perfection."). Had Gilbert Kelly perfected its security interest, this would be another story, and the charging order could not be applied to that first-in-time, perfected security interest. But Gilbert Kelly did not do so. Accordingly, there was no error in the trial court's judgment releasing the interpleaded funds to Cleopatra and ordering the MDQ entities to pay all subsequent monies otherwise payable to Mutrux, except those allocated to Katell Productions, to Cleopatra, until the judgment is satisfied.

## 2.    The Attorney Fee Order

Code of Civil Procedure section 386.6 allows the payment of costs and attorney fees, from interpleaded funds, to a stakeholder

---

transferee or to anyone else the power to exercise any rights or powers of a member, including, without limitation, the right to receive distributions to which the member is entitled." (*Id.,* subd. (b).)

13

being discharged from an interpleader action.  It also allows the court to "make such further provision for assumption of such costs and attorney fees by one or more of the adverse claimants as may appear proper."[7]  (*Id.,* subd. (a).)  Our review is for abuse of discretion.  (*Wertheim, LLC v. Omidvar* (2016) 3 Cal.App.5th 921, 925 (*Wertheim*).)

In this case, Cleopatra sought an order that Gilbert Kelly pay the attorney fees of the MDQ entities, contending Gilbert Kelly's claim to the interpleaded funds was "clearly erroneous"; as an equitable matter, Gilbert Kelly should pay the fees so that Cleopatra's recovery would not be reduced; and Code of Civil Procedure section 386.6 "recognizes this inequity" and authorizes the court to make an appropriate order.  The trial court agreed and ordered Gilbert Kelly to pay the fees.

On appeal, Gilbert Kelly argues that "unique circumstances" are necessary to justify the court's order; Gilbert Kelly had a "colorable claim" to the interpleaded funds and took its position in good faith; and it "did not drive up the litigation costs."  Gilbert Kelly relies on the *Wertheim* case for these

---

[7]  Code of Civil Procedure section 386.6 states:  "A party to an action who follows the procedure set forth in Section 386 [interpleader] may insert in his motion, petition, complaint, or cross complaint a request for allowance of his costs and reasonable attorney fees incurred in such action.  In ordering the discharge of such party, the court may, in its discretion, award such party his costs and reasonable attorney fees from the amount in dispute which has been deposited with the court.  At the time of final judgment in the action the court may make such further provision for assumption of such costs and attorney fees by one or more of the adverse claimants as may appear proper."  (*Id.,* subd. (a).)

14

propositions, and then further argues that Code of Civil Procedure section 386.6 itself requires the fees to be paid only from the interpleaded funds.  The latter contention is frivolous. It is contradicted by the statute itself, not to mention the *Wertheim* case on which Gilbert Kelly relies for its other contentions, which are likewise without merit.

*Wertheim* found the trial court did not abuse its discretion when it declined to allocate some or all of the attorney fees of the interpleading parties to the losing claimant.  (*Wertheim, supra,* 3 Cal.App.5th at p. 924; *id.* at p. 925 ["Although equity certainly would have countenanced Wertheim paying at least some of the fees, equity does not demand that it do so."].)  *Wertheim* says nothing about "unique circumstances."  *Wertheim* observes that in related litigation, both adverse claimants had admitted to conduct amounting to breach of fiduciary duty and elder abuse. (*Id.* at pp. 923-924.)  And both claimants argued that the other's litigation tactics drove up the interpleader's attorney fees.  (*Id.* at p. 923.)  The court observed that the claimant that ultimately obtained the interpleaded funds could have avoided the interpleader action, and "the trial court could reasonably find it proper that the party that necessitated the interpleader action pay for it."  (*Id.* at p. 925.)

In short, the circumstances in *Wertheim* were entirely different.  Nothing in *Wertheim* assists Gilbert Kelly in establishing an abuse of discretion by the trial court.  There was none.

15

## DISPOSITION

The judgment and the order are affirmed.  Cleopatra Records, Inc. shall recover its costs on appeal.


GRIMES, J.


WE CONCUR:


BIGELOW, P. J.


STRATTON, J.